(C. D. 1242)

MENASCO MANUFACTURING CO. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided May 9, 1950)

*Lawrence, Tuttle & Harper* (*George R. Tuttle* and *Walter I. Carpeneti* of counsel) for the plaintiff.

*David N. Edelstein,* Assistant Attorney General (*Joseph E. Weil* and *William J. Vitale,* special attorneys), for the defendant.

Before CLINE, EKWALL, and JOHNSON, Judges

JOHNSON, Judge: The merchandise in question in these two protests consists of certain parts of airplanes, such as valves, head cylinders, manifolds, tachometers, cylinder, and gear, which were assessed for duty at the rate of 30 per centum ad valorem under paragraph 370 of the Tariff Act of 1930, as airplane parts. The plaintiff claims that the merchandise was manufactured in the United States, exported to Canada, and returned to the manufacturer, and therefore is entitled to free entry under the provisions of paragraph 1615 as American goods returned. By way of amendment to the protests, it is alternatively claimed that the airplane parts are entitled to free entry under the provisions of Public Law 497, a war measure approved March 13, 1942, which suspended the payment of duty upon nonferrous-metal scrap until the termination of the national emergency proclaimed by the President on May 27, 1941. (19 U. S. C. (1940 ed., Supp. V) § 1001, par. 301.)

At the trial it was admitted that the mandatory requirements attending the free entry of American goods returned were not complied with and the claim for free entry under paragraph 1615 was not urged. It further appears that the airplane parts covered by entries 02619 and 02620 entered the United States prior to the enactment of Public Law 497. Counsel for the importer abandoned protest 104333-K covering the same.

Three witnesses testified for the importer, the first of whom was Walter E. Berger, a service engineer for the importer and located in Canada. His duty was to keep the airplane engines, manufactured by the importer, which had been sold to the Canadian Royal Air Force, in operation and to detect any defective parts. The importer herein supplied the air force with engines known as inverted 4-cylinder, 125-horsepower engines, and none of the parts thereof would fit any other make of engine. He described the valves as defective steel exhaust valves, stating that they overheated, causing "the valve to burn off at the head." The witness described the head cylinders as the upper part of the cylinder valve, attached to the cylinder barrel, which holds the valves and the mechanism which works the explosions of the engine; that it was an aluminum head, with steel inserts and bronze valve guides and studs; that they were removed from the engines because they were defective and also because the seats were loose; and that the new heads replacing them were made with a bronze seat instead of steel. The witness testified that the manifolds were sent back to be replaced; that the manifold is the distribution part of the carburetion system which fastens to the cylinders and supplies the gas in each individual head; that the defective manifolds were composed of Dow metal, a magnesium product; that they had no expansion joint between the carburetor and the number 2 and 3 cylinders, and consequently cracked; and that the new manifolds replacing same were made of aluminum. The witness stated that the tachometers returned to the United States were made of aluminum but had steel gears which froze, that is, the aluminum body became very hot and the steel gears would not hold, as there was no lubrication; and that they were replaced with a bushing made of bronze and graphite. In fact, the witness testified that all of the parts returned for replacement had to be scrapped as they were not of any use, but he had no personal knowledge of the disposition of the defective articles.

The witness further testified that when any difficulty started with the engines, the Canadian Royal Air Force would return the defective parts to the importer herein after the witness had recommended that they be so returned. The witness admitted that he was not able to inspect all the merchandise before it was returned.

The next witness, F. R. Nelson, testified that he was the shipping and receiving supervisor and received the merchandise in question, but was not interested in its condition. The receiving sheets in his handwriting were admitted in evidence. He testified further that after receiving the merchandise it was sent over to the service department, but he kept no record of the items sent to the scrap dealer,

although he knew that some cylinder heads covered by these importations were delivered to the scrap man.

One Bernard Turner, the superintendent of Turner Iron & Metals Co., dealer in scrap metal, testified that one of the company's accounts was the Menasco Manufacturing Co. and that scrap was received from that company continuously, including steel parts, aluminum, and brass; that scrap aluminum cylinder heads required that the steel rings be broken off; and that the manifolds had to have a hole cracked in them with a sledge hammer. The witness further testified that under the War Production Act there were only certain authorized dealers allowed to purchase aluminum scrap, such as a mill, foundry, or smelter, and as to steel scrap, it had to be sold to the United States Steel Corp. or Bethlehem Steel Co.

The public law under which the merchandise is claimed to be free of duty provides as follows:

[PUBLIC LAW 497—77TH CONGRESS]

[CHAPTER 180—2D SESSION]

[H. R. 6531]

AN ACT

To suspend the effectiveness during the existing national emergency of tariff duties on scrap iron, scrap steel, and nonferrous-metal scrap.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That no duties or import taxes shall be levied, collected, or payable under the Tariff Act of 1930, as amended, or under section 3425 of the Internal Revenue Code, with respect to scrap iron, scrap steel, as defined in paragraph 301 of the Tariff Act of 1930 (U. S. C., title 19, sec. 1001, par. 301), relaying and rerolling rails, or nonferrous-metal scrap entered for consumption or withdrawn from warehouse for consumption during the period beginning with the day following the date of enactment of this Act and ending with the termination of the unlimited national emergency proclaimed by the President on May 27, 1941.

Approved, March 13, 1942.

From a careful consideration of the record the court is of the opinion that the merchandise returned from Canada was undoubtedly defective parts of airplanes returned to the manufacturer. However, the only part of the shipment which was identified as having been delivered to and received by a dealer in scrap metal for sale to certain specified smelters or foundries was that of the cylinder heads. To this extent only is the claim of the plaintiff sustained as to protest 104334–K (A). In all other respects it is overruled. Protest 104333–K, having been abandoned, is hereby dismissed. Judgment will be entered accordingly.